11-1522-cv
Koch v. Cristie's Int'l PLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2011

Argued: May 2, 2012          Decided: October 4, 2012

Docket No. 11-1522-cv

_____

WILLIAM I. KOCH,

*Plaintiff-Appellant*,

—v.—

CHRISTIE'S INTERNATIONAL PLC, A U.K. PUBLIC LIMITED COMPANY,
CHRISTIE, MASON & WOODS, LIMITED, A U.K. PRIVATE LIMITED
COMPANY, CHRISTIE'S INCORPORATED, A NEW YORK CORPORATION

*Defendants-Appellees*.

_____

Before: SACK and RAGGI, <u>Circuit Judges</u>, and KOELTL, <u>District
Judge</u>.[*]

This is an appeal from the judgment of the United States

District Court for the Southern District of New York (Jones,

J.) dismissing the civil RICO conspiracy and common law fraud

claims of plaintiff-appellant William I. Koch against the

defendants after determining that the statute of limitations

_____

[*]  The Honorable John G. Koeltl, of the United States District
Court for the Southern District of New York, sitting by
designation.

for those claims had expired.  The claims relate to alleged fraud in falsely attributing bottles of wine to Thomas Jefferson's collection.  Because we find that Koch's claims were time-barred, we affirm the judgment of the District Court.

_____

Edward M. Spiro, Barbara L. Trencher, Adam L. Pollock, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY, and Irell & Manella LLP, Newport Beach, CA, for Plaintiff-Appellant William I. Koch.

Jonathan J. Lerner, Maura Barry Grinalds, Robert A. Fumerton, Patrick G. Rideout, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, for Defendants-Appellees Christie's International PLC, Christie, Mason & Woods, Ltd., and Christie's Inc..

_____

JOHN G. KOELTL, DISTRICT JUDGE:

For wine, timing is critical.  The same is true for causes of action.

This case requires us to clarify the operation of "inquiry notice" in the context of a civil action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and common law fraud claims under New York law.  This analysis is necessary to determine whether the wine-related causes of action in this case were stale when brought.  The claims relate to alleged

fraud in inflating the value of bottles of wine by falsely attributing them to Thomas Jefferson's wine collection.

Plaintiff-appellant William I. Koch appeals from the judgment of the United States District Court for the Southern District of New York (Jones, J.) that dismissed his claims against Christie's International PLC; Christie, Mason & Woods, Ltd.; and Christie's Inc. (collectively, "Christie's") because they were time-barred. The District Court dismissed the claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Koch v. Christie's International PLC, 785 F. Supp. 2d 105 (S.D.N.Y. 2011).

The essence of Koch's allegations against Christie's is that Christie's promoted as authentic a cache of wine that was ostensibly bottled in the late eighteenth century and was linked to Thomas Jefferson. Koch alleges that these "Jefferson wines" were in fact counterfeit, and that Christie's knew or was reckless in not knowing of the wines' dubious authenticity. Koch purchased four bottles of the now-discredited Jefferson wines from third-party dealers in November and December of 1988, allegedly relying on promotional representations made by Christie's. In January of 2008, Koch and Christie's agreed to toll the statute of limitations with respect to any claims against Christie's

arising out of the Jefferson wine sales. Koch then filed this lawsuit in March 2010.

Koch argues that the District Court erred in describing and applying the legal standard with respect to the doctrine of inquiry notice, under which, in some circumstances, a court imputes to a plaintiff knowledge of facts sufficient to trigger the running of the statute of limitations where the plaintiff could have discovered those facts by a reasonably diligent investigation. Koch further argues that, in any event, the Supreme Court's decision in Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010), changed the law with respect to what knowledge is required to trigger accrual in cases arising under RICO. Koch also argues that the District Court erred in dismissing his New York state law claims as time-barred because the standard for inquiry notice under New York law is different from the standard under federal law in RICO cases, and his claims should survive under the New York standard.

Because we find no error in the District Court's conclusion that Koch's claims were time-barred, we **AFFIRM** the judgment of the District Court.

**BACKGROUND**

For the purpose of reviewing the grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we accept as true the facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff. See, e.g., Muto v. CBS Corp., 668 F.3d 53, 56 (2d Cir. 2012). We provide a summary of the relevant allegations here.

The origins of this case lie with one Hardy Rodenstock, a "well-known wine connoisseur" and German national. In the mid-1980s, Rodenstock claimed to have discovered a cache of wine in a bricked-up wine cellar in Paris. The bottles bore the initials "Th.J.," as well as various late eighteenth century vintages and the names of wineries from the period. Rodenstock pronounced the bottles authentic and linked them to Thomas Jefferson who had served as the United States Minister to France in the late 1700s prior to becoming the third President of the United States and whose zeal for wine is well-documented in the historical record.

The Complaint alleges that Rodenstock had a longstanding and symbiotic relationship with Christie's and specifically with J. Michael Broadbent, a wine consultant for Christie's and the former head of its wine department. Christie's, as alleged in the Complaint, is "one of the world's largest

auction houses . . . . [and] describes itself as 'firmly at the front of the international wine auction market.'" Broadbent was the head of the wine department at Christie's in 1985, when Christie's first sold a bottle of "Th.J wine" from the Rodenstock cache, namely a bottle of "1787 Th.J Lafitte."[1]

In the run up to the first sale of Th.J. wine by Christie's, Broadbent contacted the Thomas Jefferson Foundation at Monticello. In the course of Broadbent's correspondence with Monticello historian Cinder Goodwin in November 1985, Broadbent noted at one point that there was "no actual proof" of the Th.J wine's connection to Jefferson. Goodwin, for her part, said she was skeptical, but would reserve final judgment.

Despite this, the 1985 Christie's Catalogue, in text allegedly written by Broadbent, discussed in detail Jefferson's interest in wine in connection with the Th.J Lafitte. Christie's publicized and marketed the bottle of Th.J. Lafitte in its 1985 Catalogue and publicly released a Sale Memorandum that also connected the wine to Jefferson and that represented that the Jefferson wine was in fact from the late eighteenth century. In December 1985, Christie's sold

[1] Christie's has explained that "Lafitte" was the main spelling at the end of the eighteenth century for the winery now spelled "Lafite." This opinion follows the spelling used at various points in the Complaint.

the "1787 Th.J. Lafitte" at auction for approximately $156,000, reportedly the highest price ever paid for a bottle of wine. Christie's then issued a December 9, 1985 press release that again tied the wine to Jefferson and again touted the wine's authenticity.

Shortly after the December 1985 sale, Rodenstock began corresponding with Monticello about the status of the Jefferson wine and suggested holding a wine tasting from the Th.J. cache at Monticello. Monticello's director declined, citing "doubts about the Jefferson connection." The correspondence culminated in an April 1986 letter to Rodenstock that included a research report (the "Monticello Report") prepared by historian Goodwin on December 12, 1985. The Monticello Report examined Jefferson's financial records, including records of his wine purchases, correspondence, initialed personal property, and existing wine collection, and concluded that "no solid connecting evidence could be found" between Jefferson and the Th.J. wine. The Report did not become public at that time. However, in October 1985, The New York Times published an article discussing the Th.J. wine and airing the doubts of Monticello Jefferson scholars. Another Times article that ran the day after the auction noted the "scholarly doubt" as to the authenticity of the Th.J. wine.

In 1986, Christie's placed another bottle from the Th.J. cache up for auction. Again, the Th.J. bottle was featured in the 1986 Christie's Catalogue. The description of the bottle in the Catalogue noted that "it is assumed that the wine . . . was once the property of Thomas Jefferson," and that "there is a very strong case to be made for the authenticity of the engraving and provenance." The bottle ultimately sold on December 4, 1986, for approximately $56,000. In 1987, Christie's sold another half-bottle from the Th.J. cache at an annual trade show in Bordeaux, France.

In November 1988, Koch purchased a bottle marked "1787 Branne Mouton Th.J." for $100,000. Koch allegedly purchased the bottle from Rodenstock who used the Chicago Wine Company and Farr Vintners as intermediaries. Koch alleges that he purchased the bottle in reliance on "glowing endorsements of the wines and Rodenstock," made by Christie's "with the intent to influence wine collectors like [Koch] to purchase Rodenstock's wines" and that "reasonably led [Koch] to believe that the wine offered by Rodenstock was authentic." The next month, Koch purchased three more bottles of Th.J. wine for $211,804.40. Koch purchased these bottles from Farr Vintners acting as Rodenstock's agent. The bottles were marked, respectively, as: "1787 Lafite Th.J.," "1784 Lafite Th.J.," and "1784 Branne Mouton Th.J."

-8-

In deposition testimony in a related case in Illinois state court,[2] Koch admitted that, in the early 1990s, he read several articles detailing the "real doubts" that existed with respect to the authenticity of the Th.J. wine. One news report from the period described the Th.J. wine issue as "the wine world's biggest scandal." During this period, Koch also learned of a lawsuit by a German wine collector against Rodenstock. The lawsuit alleged that the Th.J. wine was counterfeit. Koch hired attorneys in 1993 to investigate and assess the provenance of the Th.J. wine. These attorneys sent him several of the articles relating to testing of the Th.J. wine that had been conducted for the purpose of the German lawsuit, some of which had confirmed the wine as authentic and some of which had indicated that it was counterfeit. Koch received legal advice concerning a potential action against Rodenstock in 1993 and sought the advice of counsel again in 1995. However, Koch took no legal action over the course of

---

[2] The District Court in this case took judicial notice of the press coverage of the controversy and litigation surrounding the Th.J. wines, as well as the court documents and documents in the public record that were "integral to the complaint." Koch, 785 F. Supp. 2d at 111-12 (citing Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) and Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)). Koch raised no specific objection to the consideration of these documents at the motion to dismiss stage, id. at 112, and does not raise the issue in this appeal.

the 1990s, as the debate over the authenticity of the Th.J. wine continued.

In October 2000, Koch sent samples of the Th.J. wine to the Woods Hole Oceanographic Institution ("Woods Hole") for radiocarbon testing to determine their age. In his deposition testimony in the Illinois litigation, he testified that he sent the samples for testing to see if he had been "hoaxed." The October 16, 2000 Report from Woods Hole (the "Woods Hole Report") indicated that there was a 26.5% probability that the wine was from the time period between the year 1680 and 1740 and a 68.9% probability that the wine was from between 1800 and 1960. The Report appears to indicate only a 4.6% probability that the wine was from the period between 1740 and 1800, the only period that would have been consistent with the engraving on each of the bottles that Koch bought. Woods Hole estimated the wine's radiocarbon age as 90 years, with a standard deviation of 35 years, although the Woods Hole Report notes that this age "does not convert directly to a calendar, or chronological, age," and that, more broadly, "the past 350-400 year period is a very difficult one for determining calendar ages." Koch apparently viewed these results as "neutral," and he took no further action to investigate the authenticity of the Th.J. wine in response to the Woods Hole testing.

In 2005, Koch was asked to include a photograph of his bottles of Th.J. wine in a museum catalog. Koch alleges that, as part of the preparation of the catalog materials, his staff contacted Monticello "to confirm the provenance of the Th.J. wine." This communication ultimately led to obtaining the 1985 Monticello Report, which became public shortly thereafter. Koch alleges that, in response to the "credible and serious questions" concerning the wine's authenticity raised by the Monticello Report, he then conducted an investigation that revealed that the Th.J. wine was counterfeit. By 2009, Koch had allegedly tracked down German engravers who claimed to have engraved the bottles with the "Th.J." initials.

On August 31, 2006, less than 18 months after he had obtained a copy of the Monticello Report, Koch sued Rodenstock in the Southern District of New York for fraud in connection with the Th.J. wine. Rodenstock never appeared and the District Court entered a default judgment against him in 2010. See Complaint, Koch v. Rodenstock, No. 06 Civ. 6586 (S.D.N.Y. Aug. 31, 2006), ECF No. 1; Koch v. Rodenstock, No. 06 Civ. 6586, 2010 WL 2010900 (S.D.N.Y. May 18, 2010), ECF No. 82 (Order Entering Judgment of Default).

Koch filed this lawsuit on March 30, 2010, asserting claims against Christie's for a civil RICO violation of 18

-11-

U.S.C. § 1962(c) and civil conspiracy to defraud and aiding and abetting fraud in violation of New York Law.  Koch alleged that Christie's conducted an enterprise and participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Koch sought treble damages under 18 U.S.C. § 1964(c) and an injunction under 18 U.S.C. § 1964(a).  Koch also asserted a claim for violation of New York's General Business Law § 349.

On March 18, 2011, the District Court dismissed all claims against Christie's as time-barred.  The District Court held that Koch "was on inquiry notice of his injuries no later than October 16, 2000, when he submitted the Th.J bottle for testing," and that the four-year statute of limitations for a RICO cause of action and the two-year statute of limitations, which applies to Koch's state law claims, began to run on that date.  Koch, 785 F. Supp. 2d at 115-16, 118.  The District Court also held that the doctrine of equitable tolling did not apply to Koch's causes of action.  Id. at 116-19.  The Court also dismissed the claim under New York's General Business Law § 349, a ruling Koch does not appeal.

This appeal followed.  Our review of the District Court's grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and of the District Court's

-12-

"interpretation and application of a statute of limitations," is de novo.  See Muto, 668 F.3d at 56.

**DISCUSSION**

**I.**

RICO claims are subject to a four-year statute of limitations.  See Rotella v. Wood, 528 U.S. 549, 552 (2000); Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987); Pearl v. City of Long Beach, 296 F.3d 76, 79 n.1 (2d Cir. 2002).  "Federal courts . . . generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here."  Rotella, 528 U.S. at 555; In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998).  The District Court held that "[t]he clock begins to run when the plaintiff has 'inquiry notice' of his injury, namely when he discovers or reasonably should have discovered the RICO injury."  Koch, 785 F. Supp. 2d at 114 (citing Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1102 (2d Cir. 1988)).

Koch contends that the District Court incorrectly applied the law with respect to what facts must be discovered for a RICO claim to accrue.  Koch argues that the District Court misinterpreted the Supreme Court's decision in Rotella as supporting a "discovery of the injury standard," and that, in

-13-

any event, the Supreme Court's recent decision in Merck, 130 S. Ct. 1784, requires that a plaintiff have knowledge of a defendant's scienter, as well as the alleged injury, for the plaintiff's claim to accrue. This threshold question is one of first impression for this Court.

Koch argues that the Court in Rotella declined to "settle upon a final rule" with respect to RICO claim accrual. 528 U.S. at 554 n.2. That argument fails to appreciate the impact of Rotella. In Rotella, the Supreme Court resolved a conflict among the Courts of Appeals between "some form of the injury discovery rule (preferred by a majority of Circuits to have considered it), and the injury and pattern discovery rule." Id. at 554. The Court definitively "eliminate[d] the latter." Id. The Court left open the possibility of "a straight injury occurrence rule" unsoftened by an extension to allow for reasonable discovery, id. at 554 n.2, but such a rule would be even less favorable to plaintiffs like Koch who assert RICO claims decades after the alleged injury occurred. However, the Court made plain that, to the extent that "a discovery accrual rule" applies, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Id. at 555.

This Court's decisions in RICO cases have followed Rotella's plain language on this point. See, e.g., World

-14-

*Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009) (summary order); *Frankel v. Cole*, 313 F. App'x 418, 419-20 (2d Cir. 2009) (summary order); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 (2d Cir. 2008) (RICO's four-year statute of limitations "begins to run when the plaintiff discovers-or should reasonably have discovered-the alleged injury"), *abrogated in part on other grounds by*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Merrill Lynch P'ships*, 154 F.3d at 60 ("[T]his Circuit has adopted an 'injury discovery' rule in RICO cases which holds that 'a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury.'" (quoting *Bankers Trust*, 859 F.2d at 1103)).

Koch argues that the Supreme Court's recent decision in *Merck* overruled *Rotella* and that, after *Merck*, a RICO plaintiff must have discovered the facts showing the fraud, including scienter. This argument is without merit.

*Merck* arose out of an alleged violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). *See* 130 S. Ct. at 1790. Because it was a securities fraud action, 28 U.S.C. § 1658(b) governed the accrual rule in *Merck*. That section provides:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

28 U.S.C. § 1658(b); see Merck, 130 S. Ct. at 1790.

At issue in Merck was the meaning of the statutory terms "the facts constituting the violation." Id. at 1796. The Court held that "facts showing scienter are among those that 'constitut[e] the violation.'" Id. (quoting 28 U.S.C. § 1658(b)) (alterations in original). This Court has followed that holding in subsequent securities fraud cases. See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 173 (2d Cir. 2011) (Merck "changed the securities fraud law of this Circuit with respect to the onset of the applicable two-year statute of limitations.").

But § 1658(b) does not apply to RICO actions. With respect to accrual, the civil RICO statute is "silent on the issue." Rotella, 528 U.S. at 555. In such circumstances, "[f]ederal courts . . . generally apply a discovery accrual rule." Id. "[I]n applying a discovery accrual rule, . . . discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Id. Nothing in

-16-

*Merck*'s discussion of § 1658(b) purports to alter this well-established rule or even to apply it outside the context of the statute at issue in that case. At bottom, *Merck* involved a situation where the statute was not silent, but rather stated that discovery of the facts constituting the "violation" lead to accrual. *Merck*, in other words, involved a statutory exception to the common law rule discussed in *Rotella*. *See* Jay E. Hayden Found. v. First Neighbor Bank, N.A., 610 F.3d 382, 387 (7th Cir. 2010) ("For remember that it's the discovery of the injury (and injurer) . . . that starts the limitations period running . . . . That at least is the general rule, though there are exceptions; the limitations period in the Securities Exchange Act of 1934, for example, doesn't begin to run until the plaintiff discovers 'the facts constituting the violation.' But RICO requires discovery only of the injury and the injurer." (citing *Merck* 130 S. Ct. at 1796-97)) (citation omitted).

There is a presumption that the Supreme Court does not overrule itself *sub silentio*. *See, e.g.*, Hohn v. United States, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."). *Merck* never mentioned *Rotella* and did not discuss the rationale for the discovery of

-17-

the injury rule that Rotella adopted.  The underlying rationale of the Court's decisions in both Rotella and Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997), upon which Rotella relied, was concerned with the lengthy limitations period that would flow from a "last predicate act" discovery rule, Klehr, 521 U.S. at 186, or an "injury and pattern discovery rule," Rotella, 528 U.S. at 554.  The Supreme Court rejected these because they "would allow proof of a defendant's acts even more remote from time of trial and, hence, litigation even more at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities."  Id. at 555.

In Rotella, the appellant proposed an "accrual rule softened by a pattern discovery feature."  Id. at 558.  Koch proposes an accrual rule softened by a scienter discovery feature.  Here, as in Rotella, such a softening feature "would undercut every single policy" served by limitations provisions. Id. at 558-59 ("A limitations period that would have begun to run only eight years after a claim became ripe would bar repose, prove a godsend to stale claims, and doom any hope of certainty in identifying potential liability.").  It would also dilute the incentive of private attorneys general diligently to investigate, prosecute, and bring unlawful

-18-

activity to light.  See Klehr, 521 U.S. at 195 ("[P]rivate civil [antitrust and RICO] actions seek not only to compensate victims but also to encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity."); see also Rotella, 528 U.S. at 559 (noting Congress's intent to create "a civil enforcement scheme parallel to the Clayton Act regime, aimed at rewarding the swift who undertake litigation in the public good.").

The injury discovery rule serves those policies by holding plaintiffs to a high standard.  The Court in Rotella considered and rejected the argument that RICO fraud claims demand a more "lenient" rule of accrual, id. at 557, and noted specifically that the requirement to plead RICO fraud claims with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure was not a basis for rejecting the discovery of the injury rule for accrual.  Id. at 560-61.

The rule of accrual for securities fraud cases pursuant to § 1658(b) is a statutory exception to the injury discovery rule.  In the securities fraud context, discovery of facts constituting the violation, including scienter, is necessary for the claim to accrue because the statute of limitations requires it.  Pontiac, 637 F.3d at 174 (citing Merck, 130 S. Ct. at 1798).  But Merck's scienter discovery requirement does not apply outside the realm of the statute that it interpreted.

It remains the law in this Circuit that a RICO claim accrues upon the discovery of the injury alone.

                              **II.**

The next issue is when Koch's claim accrued.

In a RICO case, the first step in the statute of limitations analysis is to determine when the plaintiff sustained the alleged injury for which the plaintiff seeks redress.  The court then determines when the plaintiff "discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point." Merrill Lynch P'Ships, 154 F.3d at 59.  As a general matter, "the limitations period does not begin to run until [a plaintiff] ha[s] actual or inquiry notice of the injury."  Id. at 60.

The District Court in this case held that "[t]he RICO statute of limitations . . . runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry."  Koch, 785 F. Supp. 2d at 114 (quoting Jakks, 328 F. App'x at 697).  Such storm warnings, the District Court explained, "need not detail every aspect of the alleged fraudulent scheme."  Id. (quoting Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir. 2008)).  Rather,

-20-

such storm warnings are sufficient where, "a person of ordinary intelligence would consider it 'probable' that fraud had occurred." Id. (quoting Dodds v. Cigna Secs., Inc., 12 F.3d 346, 350 (2d Cir. 1993)).[3] We agree that the statute of limitations began to run at least by October 2000, by which time Koch was on inquiry notice with respect to his RICO injury, and therefore the RICO claim was time-barred before January 2008, when Koch and Christie's agreed to toll the statute of limitations.

---

[3] Koch argues that the District Court erred in holding that he was "on inquiry notice of his injuries no later than October 16, 2000," because "[b]y this date, a reasonable person should have been alerted to 'storm warnings' that the Th.J wine was possibly counterfeit." Koch, 785 F. Supp. 2d at 116 (emphasis added). However, the District Court correctly stated, in the section of its opinion laying out the legal standard, that the standard for triggering inquiry notice is whether "a person of ordinary intelligence would consider it 'probable' that fraud had occurred." Koch, 785 F. Supp. 2d at 114 (citing Dodds, 12 F.3d at 350). Moreover, while the District Court's language may have been incorrect inasmuch as it used the term "possible" rather than "probable," the District Court's holding was plainly that there was "ample evidence showing Plaintiff was aware of his injuries no later than October 16, 2000." Id. at 116. In any event, our review of the District Court's decision with respect to inquiry notice is de novo, and, as explained in greater detail below, the District Court reached the correct conclusion because the Woods Hole Report, which indicated a greater than 90% chance that the Th.J. wine was not from the date that it purported to be, would suggest to a plaintiff of reasonable intelligence that his injury was probable, not simply possible.

In Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d. Cir. 2005), this Court set out a detailed description of when inquiry notice occurs:

> Inquiry notice-often called "storm warnings" in the securities context-gives rise to a duty of inquiry "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) "[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute knowledge of what an investor in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."

Id. at 168 (citations omitted).

While inquiry notice as described in Lentell was developed in the context of securities fraud cases, it applies equally in RICO cases. See, e.g., Jakks, 328 F. App'x at 697; Merrill Lynch P'Ships, 154 F.3d at 60. In the securities fraud context, this Court has recently explained that "Merck overruled this analysis." Pontiac, 637 F.3d at 174 (quoting Merck, 130 S. Ct. at 1798). Merck held that, in securities fraud actions, "the limitations period begins to run only after 'a reasonably diligent plaintiff would have discovered

-22-

the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.'" Id. (quoting Merck, 130 S. Ct. at 1798). However, as discussed above, the Court's holding in Merck on this point was grounded explicitly on the securities-related statute at issue in that case, which tied the statute of limitations to the "discovery of the facts constituting the violation." Merck, 130 S. Ct. at 1796. The Court acknowledged that the common law rule, which imputes knowledge as of the date of inquiry notice to a plaintiff who makes no inquiry for the entire statutory period after the duty to inquire arose, might be unaffected. Id. at 1797 ("[T]he court-created 'discovery rule' exception to ordinary statutes of limitations is not generally available to plaintiffs who fail to pursue their claims with reasonable diligence. But we are dealing here with a statute, not a court-created exception to a statute.").

This Court's pre-Merck securities fraud cases grounded inquiry notice doctrine upon common law principles that are applicable to RICO actions. See, e.g., Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983) ("[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have

developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." (quoting Higgins v. Crouse, 42 N.E. 6, 7 (N.Y. 1895))). Compare Dodds, 12 F.3d at 350 ("[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." (citing Armstrong, 699 F.2d at 88)).[4] And this Court has previously drawn on the pre-Merck securities fraud cases in explaining the nature of inquiry notice and accrual in RICO actions. See, e.g., Merrill Lynch P'ships, 154 F.3d at 60 (citing Dodds, 12

---

[4] That the Lentell analysis treats differently plaintiffs who act differently comports with the discovery rule's animating common law principle: parties have a duty to pursue potential claims with reasonable diligence. Compare Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946) ("[T]his Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered.'" (quoting Bailey v. Glover, 88 U.S. 342, 348 (1874))) (emphasis added), with Higgins, 42 N.E. at 6-7 ("When . . . facts are known from which the inference of fraud follows, there is a discovery of the facts constituting the fraud . . . . That the defrauded party did not actually draw the inference, but shut his eyes to it, does not stop the running of the statute. He ought to have known, and so is presumed to have known, the fraud perpetrated.").

F.3d at 350). Because <u>Merck</u> was interpreting the meaning of the term "discovery" in the accrual statute for securities fraud actions,[5] it did not alter the accrual rules for RICO actions. Therefore, the <u>Lentell</u> articulation of inquiry notice continues to apply in RICO actions.

Koch argues that, notwithstanding <u>Lentell</u>, inquiry notice can never trigger the running of the statute of limitations. Rather, he argues, the statute does not begin to run until a plaintiff "in the exercise of reasonable diligence, should have discovered" the injury. See <u>Rothman v. Gregor</u>, 220 F.3d 81, 97 (2d Cir. 2000) (quoting <u>Sterlin v. Biomune Sys.</u>, 154 F.3d 1191, 1201 (10th Cir. 1998)). However, in <u>Rothman</u>, which preceded <u>Lentell</u>, the plaintiffs "actually inquired further after" a duty of inquiry arose. <u>Id.</u> at 97. <u>Rothman</u>, a securities fraud case, is illustrative of <u>Lentell</u>'s second prong; in that case, it would have been improper to begin the running of the statute at the time that the duty to inquire arose. Where a RICO plaintiff does begin or has begun to inquire once the duty arises, the Court must determine when a reasonably diligent investigation would have revealed the

---

[5] Indeed, the Court in <u>Merck</u> rejected altogether the application of inquiry notice in 28 U.S.C. § 1658(b), finding that "[w]e cannot reconcile it with the statute, which simply provides that 'discovery' is the event that triggers the 2-year limitations period." 130 S. Ct. at 1798.

injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date. Cf. Lentell, 396 F.3d at 168. The existence of "storm warnings" sufficient to trigger inquiry notice does not begin the clock when the plaintiff actually pursues an investigation.

Nevertheless, when a RICO plaintiff "makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." Id. Thus, once there are sufficient "storm warnings" to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred. In such a case, knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive. See Jakks, 328 F. App'x at 697 ("The RICO statute of limitations . . . runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry.").

The District Court correctly determined that this is such a case. At least by October 16, 2000, when the Woods Hole Report was issued, inquiry notice had been triggered. By then, Koch was aware of numerous articles noting that the provenance of the Th.J wine could not be proved and noting comments by Monticello experts on Thomas Jefferson that cast

-26-

serious doubt on Jefferson's ownership or relationship to the wine. Attorneys retained to investigate the authenticity of the Th.J. wine brought these articles to Koch's attention. Around that same time, the plaintiff became aware of a lawsuit in a German court accusing the man who supposedly found the Th.J wine and from whom the plaintiff had bought the wine, of forging the bottles, based on testing that dated the wine to 1960. The Woods Hole Report indicated that the wine was likely not from the period that the defendants had claimed it to be. Indeed, the Woods Hole Report indicated a greater than 90% probability that the Th.J. wine was not from the years listed on their bottles. All of these facts, but particularly the Woods Hole testing, which related directly to the authenticity of the age of the wine and not merely to its relationship to Thomas Jefferson, would suggest to a reasonably intelligent person that the wine was not authentic. The circumstances suggested far more than the "mere possibility" that Koch had bought counterfeit wine. Thus, by October 16, 2000, Koch had a duty to conduct a reasonably diligent investigation into the Th.J. wine.

It is not disputed that Koch did not begin any such investigation until 2005. Because the duty to inquire had arisen and been unmet for more than four years, the District

-27-

Court correctly imputed to Koch knowledge of the injury as of the date the duty arose. His claim is therefore time-barred.

## III.

Koch also argues that the District Court erred in dismissing his common law fraudulent conspiracy and aiding and abetting claims. Under New York law, the time within which an action based upon fraud must be commenced is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. 213(8) (MCKINNEY 2004); see Sargiss v. Magarelli, 909 N.E. 2d 573, 576 (N.Y. 2009). Because the alleged fraud was completed in 1988, when Koch purchased the Th.J. wine, his common law claims are timely only if they were brought within two years of the date the fraud was discovered or could have been discovered with reasonable diligence.

Koch relies on Erbe v. Lincoln Rochester Trust Co., 144 N.E.2d 78 (N.Y. 1957), for the proposition that whether a plaintiff is "possessed of knowledge of facts from which [fraud] could be reasonably inferred," such that the statute of limitations begins to run, "[o]rdinarily . . . presents a mixed question of law and fact and, where it does not conclusively appear that the plaintiffs had knowledge of facts

-28-

of that nature a complaint should not be dismissed on motion." Id. at 80-81. He argues that New York law provides a higher threshold for inquiry notice than the standard under RICO law, and that this precludes dismissal of a fraud claim on a motion to dismiss. This argument is without merit.

Erbe arose from a bank's sale of stock in a closely-held corporation. Id. at 79. The bank was an executor and creditor of an estate, a major portion of which consisted of stock. Id. In 1943, the bank sold the stock to itself at a public auction. Id. The plaintiffs, who were interested in the estate, sued ten years later for fraud, and the action was dismissed on the grounds that it was barred by the six year statute of limitations that then existed.[6] Id. at 79-80.

---

[6] At the time Erbe was decided, "[t]he New York Civil Practice Act, § 48, subd. 5, provide[d] a six-year period of limitations as to actions for fraud, a period which [began] to run only from the discovery of the fraud." Rieser v. Balt. & Ohio R.R. Co., 228 F.2d 563, 566 (2d Cir. 1955); see Civil Practice Act § 48, subd. 5, compiled in, 8 Gilbert-Bliss Civil Practice of the State of New York 13 (1956) ("The cause of action in [a fraud] case is not deemed to have accrued until the discovery by the plaintiff . . . of the facts constituting the fraud"); see also Erbe, 144 N.E.2d at 80 (citing Civil Practice Act, § 48, subd. 5).
    In 1965, New York enacted the predecessor of what is now N.Y. C.P.L.R § 203(g). See 1965 N.Y. Laws 56. That section now provides, with certain exceptions, that "where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, . . . the action must be commenced within two years after such actual or imputed discovery or within the period otherwise

The New York Court of Appeals reversed the dismissal, because the record did not "disclose a sufficient basis for imputing a knowledge of the fraud alleged to the plaintiffs at a date greater than six years prior to the commencement of this action." Id. at 80. The Court characterized the facts in the record as merely "facts which aroused plaintiffs' suspicions as to the defendant bank's good faith in the prior Surrogate's proceedings," and "not necessarily knowledge of facts from which the alleged fraudulent conspiracy might be reasonably inferred." Id. at 81. However, the Court

provided, computed from the time the cause of action accrued, whichever is longer." N.Y. C.P.L.R. 203(g) (MCKINNEY 2001). The section was enacted at the suggestion of the joint legislative committee tasked with overhauling New York's system of civil practice in the early 1960s. See 7B McKinney's Consolidated Laws of N.Y. Ann. § 203, at 213 (2003). The joint committee recommended the shorter discovery rule because "where the facts are not discovered, and the period consequently would not begin to run until long after the event, there seems no reason why the plaintiff should not be required to proceed expeditiously after such discovery." Sixth Report to the Legislature by the Senate Finance Committee Relative to the Revision of the Civil Practice Act 74 (1962). The joint committee acknowledged that, at the time, the proposed two-year discovery provision "ha[d] no counterpart in present practice." Id.; see also 1 Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 203.App.03 (2d Ed.) (noting that the two-year discovery provision had "no precedent either in New York statutory or case law."). In 2004, N.Y. C.P.L.R. § 213(8), the limitations provision for fraud-based actions, was amended to include explicitly the two year discovery limitation of § 203(g), although New York courts had applied the two-year discovery provision to fraud actions since the provision's enactment. Id. at ¶¶ 203.35, 213App.01, 213App.03.

-30-

acknowledged the longstanding rule in New York that "plaintiffs will be held to have discovered the fraud when it is established that they were possessed of knowledge of facts from which it could be reasonably inferred, that is, inferred from facts which indicate the alleged fraud." Id. at 80.

The statement of New York law in Erbe remains accurate. See Sargiss, 909 N.E.2d at 576 ("The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred.' 'Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute.' 'Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts.'" (quoting Erbe, 144 N.E.2d at 80-81)) (internal citations omitted). However, New York law does not support a contrary result in this case.

Unlike in Erbe, there is no factual dispute about what knowledge Koch had in this case; rather, the question is whether he could reasonably have inferred the fraud from that knowledge. For the reasons already explained, Koch could have inferred the fraud based on the facts he had in October 2000,

-31-

when he learned that there was a high probability that the wine that he alleges he bought in reliance on the representations of authenticity made by Christie's was in fact counterfeit, and certainly by 2005, when he came into possession of the Monticello Report.  Even beginning to run the limitations period at the latter date would render Koch's common law claims time-barred under New York's two-year statute of limitations.

Moreover, New York law recognizes, as RICO law does, that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation.  See Gutkin v Siegal, 926 N.Y.S.2d 485, 486 (App. Div. 2011) ("'[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him'" (quoting Higgins, 42 N.E. at 7)).  Thus, while it is true that New York courts will not grant a motion to dismiss a fraud claim where the plaintiff's knowledge is disputed, it is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish

-32-

that a duty of inquiry existed and that an inquiry was not pursued.[7]  See Sielcken-Schwarz v. Am. Factors, 192 N.E. 307, 310 (N.Y. 1934) (citing Higgins, 42 N.E. at 7); see, e.g, Shalik v. Hewlett Assocs., L.P., 940 N.Y.S.2d 304, 305-06 (App. Div. 2012) ("The two-year period begins to run when the circumstances reasonably would suggest to the plaintiff that he or she may have been defrauded, so as to trigger a duty to inquire on his or her part") (citation omitted) (affirming dismissal because "the defendants established, prima facie, that the plaintiffs possessed information regarding the questionable authenticity of the decedent's signature on the Amendment more than two years before they filed the complaint"); Gutkin, 926 N.Y.S.2d at 486; Waters of Saratoga Springs, Inc. v. New York, 498 N.Y.S.2d 196, 199 (App. Div. 1986), aff'd, 498 N.E.2d 146 (N.Y. 1986).

---

[7] New York Courts also grant summary judgment based on the same clear principle that if a plaintiff is on inquiry notice and fails to make any investigation for two years, the plaintiff's action will be time-barred under the two-year discovery rule.  See, e.g., Marasa v. Andrews, 892 N.Y.S.2d 494, 495 (App. Div. 2010); TMG-II v. Price Waterhouse & Co., 572 N.Y.S.2d 6, 7 (App. Div. 1991) (holding that, based on published news reports detailing a lawsuit filed against the defendant, "the underlying facts of the fraud claim against [the defendant], to the extent that they were not already known, could have been discovered with the exercise of due diligence more than two years before the action was commenced"), leave to appeal denied, 588 N.E.2d 97 (N.Y. 1992).

Indeed, the standard applied in this Circuit with respect to inquiry notice in RICO and pre-Merck securities fraud cases shares its origin with the standard for inquiry notice under New York law. In Armstrong v. McAlpin, this Court adopted the language of Higgins v. Crouse, a seminal case with respect to the common law of inquiry notice in New York, finding Higgins "fully applicable in cases such as the instant one, which involve claims of securities fraud." 699 F.2d at 88. Koch presents no argument why the rule under New York law is different from the RICO rule: where the facts would suggest the probability of fraud to a reasonably intelligent person, failure to investigate will prove fatal to the plaintiff's claim if such a claim is not brought within the statutory limitations period beginning from the time of such inquiry notice.

The District Court in this case concluded that "[i]t is clear that as of the testing of the wine in 2000, Plaintiff 'had knowledge of facts from which the alleged fraud might reasonably be inferred.'" Koch, 785 F. Supp. 2d at 118 (quoting Jeffrey BB. v. Cardinal McCloskey Sch., & Home for Children, 689 N.Y.S.2d 721, 724 (App. Div. 1999)). This conclusion was correct. At the very least, the Woods Hole Report prompted a duty to inquire under New York law, and, because Koch made no such inquiry over the course of the next

-34-

two years, knowledge of the fraud can be imputed to him.[8] See, e.g., Shalik, 940 N.Y.S.2d at 305.  The District Court properly dismissed Koch's common law fraud claims.

## IV.

Finally, Koch argues that the District Court erred in refusing to toll the statute of limitations in this case due to alleged fraudulent concealment by Christie's.  This argument is without merit.

"Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Corcoran v. N.Y. Power Auth., 202 F.3d 530, 543 (2d Cir. 1999) (internal citation omitted); see also Abbas v. Dixon, 480 F.3d

---

[8] Koch does not appear to press the argument that, under New York law, all of the elements of the fraud, including scienter, must be known for the claim to accrue.  Even if he did we would not need to reach the question.  Koch failed to make any investigation after he was on inquiry notice of the fraud in October 2000 until at least 2005, by which time the two-year statute of limitations had expired.

-35-

636, 642 (2d Cir. 2007) ("Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action") (internal quotation marks and citation omitted).  "We review a district court's decision to deny equitable tolling for abuse of discretion." Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 81 (2d Cir. 2003).

Reasonable diligence is a prerequisite to the applicability of equitable tolling.  See, e.g., Klehr, 521 U.S. at 194 ("[A RICO] plaintiff who is not reasonably diligent may not assert fraudulent concealment") (internal quotation marks omitted); Abbas, 480 F.3d at 642 (noting with respect to equitable tolling under New York law that diligence is an "essential element of equitable relief") (citation omitted).  Based on the undisputed fact that Koch did not pursue any investigation for over four years after receiving the Woods Hole Report, Koch did not act with reasonable diligence during that period.  While Koch makes specific allegations with respect to the 2006 efforts of Christie's and Broadbent to hinder his investigation, the District Court correctly found that those allegations were irrelevant because the statute of limitations had already run by that time.  As

-36-

the District Court explained with respect to those allegations, the "tolling period cannot delay the expiration of a deadline when that deadline has already expired." Koch, 785 F. Supp. 2d at 117 (quoting Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 108 (2d Cir. 2005)).

Koch's allegations with respect to the period before the Woods Hole Report, such as the somewhat generalized allegation that Christie's intentionally failed to disclose the details of the Monticello Report, do not indicate how Christie's prevented Koch from discovering his claim. Koch alleges that he was able to obtain the Monticello Report by simply making a phone call and that within two years he had uncovered the fraud. There is no allegation that any defendant took any action that prevented Koch from making the same phone call immediately after he had seen the Woods Hole Report in October 2000. The ineluctable conclusion is that Koch failed to file his claim within the statute of limitations not due to the defendants' fraudulent concealment, but due to his own failure to exercise reasonable diligence. The District Court's refusal to apply an equitable toll to any of Koch's causes of action was not an abuse of discretion.

**CONCLUSION**

We have considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit.  For the reasons explained above, we **AFFIRM** the judgment of the District Court.