[57 NYS3d 119]

MBI International Holdings Inc. et al., Appellants, v Barclays Bank PLC, Respondent.

First Department, June 1, 2017

APPEARANCES OF COUNSEL

*Kirkland & Ellis LLP*, Washington, D.C. (*Paul D. Clement*, of the District of Columbia bar, the Virginia bar and the Wisconsin bar, admitted pro hac vice, of counsel, and *Jeffrey M. Harris*, of the District of Columbia bar and the California bar, admitted pro hac vice, of counsel), *Kirkland & Ellis LLP*, New York City (*Stephen V. Potenza* of counsel), and *Patterson Belknap Webb & Tyler LLP*, New York City (*Craig A. Newman* and *Muhammad U. Faridi* of counsel), for appellants.

*Wilkie Farr & Gallagher LLP*, New York City (*Todd G. Cosenza, William A. O'Brien* and *Frank Scaduto* of counsel), for respondent.

## OPINION OF THE COURT

FEINMAN, J.

This appeal arises out of an alleged scheme to defraud a Saudi Arabian residential real estate developer out of hundreds of millions of dollars owed to it by the Saudi government. Its resolution requires us to construe New York's date of discovery rule for purposes of ascertaining when the statute of limitations was triggered with respect to plaintiffs' fraud-based claims. Ultimately, the result we reach today embraces the well-settled rule established in New York long ago:

> "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he [or she] has been defrauded, a duty of inquiry arises, and if he [or she] . . . shuts his [or her] eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him [or her]" (*Higgins v Crouse*, 147 NY 411, 416 [1895, Finch, J.]).

Thus, we affirm the motion court's holding to the extent it dismissed plaintiffs' action as time-barred.

In the early 1990s, plaintiff Jadawel International Company, a Saudi Arabian real estate development company, constructed two luxury residential compounds in Saudi Arabia. Jadawel is a subsidiary of plaintiff MBI International Holdings Inc., a British Virgin Islands holding company founded by prominent Saudi Arabian billionaire Sheikh Mohamed Bin Issa Al Jaber. The compounds, containing 1,000 luxury villas, housed senior employees of two U.S. government contractors, who passed on the costs of rental payments to the Saudi government through the U.S. Department of Defense's Foreign Military Sales

program. In March 1999, at the Saudi government's request, Jadawel and the Saudi government entered into direct lease agreements for the compounds (the lease agreements). Pursuant to the lease agreements, Jadawel was entitled to annual lease payments from the Saudi government for an 18-year term through 2017, totaling in excess of $2 billion.

In September 2000, MBI sought to monetize the first 10 years of lease payments in order to refinance a loan it took to finance construction of the compounds and to finance real estate opportunities. In order to do so, MBI created nonparty Compound Lending Company (CLC) as a special financing vehicle, which plaintiffs allege became Jadawel's designated agent to collect annual payments due from the Saudi government during the first 10 years of the lease agreements between 2001 and 2011.[1] These 11 annual payments under the leases were to be paid by the Saudi government directly into two New York collection accounts maintained by CLC at the Bank of New York.

In connection with the refinancing, on June 14, 2001, CLC secured the extension of a $450 million bridge loan from defendant Barclays Bank PLC. On December 27, 2001, Barclays led a bank syndicate in providing a $900 million term loan to CLC (the term facility agreement).[2] Of this $900 million, CLC used $450 million to repay the bridge loan, and the remaining $450 million was made immediately available for plaintiffs to finance new real estate investments. Under the term facility agreement, the bank syndicate was to be repaid the $900 million term loan, plus interest, out of the $1.4 billion in expected lease payments from the Saudi government. The surplus, totaling over $200 million, or the residual payments made after the term loan plus interest was repaid in full, was to go to CLC for the benefit of plaintiffs.

Under the term facility agreement, as collateral for the $900 million term loan, CLC pledged a security interest in: (1) CLC's right to collect lease payments from the Saudi government; (2)

---

1. Plaintiffs allege that while forming CLC, two Saudi legal instruments, known as "hawalas," were created. A hawala enables party A to transfer to party B its obligation to pay a debt owed to party C. Plaintiffs claim that because no debt was owed by Jadawel to CLC, under Saudi law, instead of functioning as an assignment, the arrangement was automatically deemed a "wakala," a legal relationship which resembles agency.

2. The other lenders of the syndicate, none of which are parties in the instant action, were The Industrial Bank of Japan, Ltd., Dresdner Bank Luxembourg S.A., and Saudi American Bank. Each of the lenders, including Barclays, lent $225 million to CLC under the term facility agreement.

all of CLC's shares; and (3) CLC's depositary accounts with the Bank of New York. Thus, in an event of default, the bank syndicate's security trustee had the right to assume control of CLC and its bank accounts, and had the right to enforce the Saudi government's payment obligations under the lease agreements. As further provided, in an event of default, the security trustee was entitled to collect such sums and distribute them in the following order of priority: first, to the bank syndicate in their relevant proportions; and then any additional amount recovered would go to CLC for plaintiffs' benefit.

On April 1, 2002, the Saudi government failed to make its first lease payment to CLC after the term facility agreement became effective. As a result, CLC failed to make its first payment to the syndicate, triggering an event of default, which entitled the security trustee to assume control of CLC and become responsible for collecting the lease payments from the Saudi government. The security trustee informed the Saudi government that it assumed control of CLC's right to enforce the lease payments. After the Saudi government failed to remedy its default, the security trustee, on behalf of Barclays and the rest of the bank syndicate, brought suit in 2002 against the Saudi government in the United States District Court for the Southern District of New York for breach of contract and a declaration that the Saudi government was obligated to continue payments under the lease agreements.

However, on April 1, 2003, the security trustee voluntarily withdrew its complaint, without prejudice, allegedly to facilitate possible settlement negotiations (*see* notice of voluntary dismissal, *Dresdner Bank v Ministry of Fin.*, US Dist Ct, SD NY, 1:02 Civ 09618, Martin, J., 2003). In or around July 2006, the bank syndicate entered into a settlement agreement with the Saudi government, the terms of which are confidential (the 2006 settlement). In connection with the 2006 settlement, CLC did not receive any amount of the hundreds of millions of dollars in residual payments it was entitled to under the term facility agreement.

In 2007, after CLC's claims against the Saudi government were released through the 2006 settlement, the Saudi government informed Jadawel of its intent to abandon its performance under the lease agreements for the years of 2011 through 2017. Thereafter, Jadawel brought suit against the Saudi government in Saudi Arabia to enforce the lease agreements. In 2008, a Saudi court ruled that because the bank syndicate

had settled CLC's claims, Jadawel no longer had any right to recover against the Saudi government. As a result of this ruling, Jadawel maintained ownership of the compounds, but with a tenant who was no longer paying hundreds of millions of dollars in rent. Jadawel was therefore forced to sell the compounds at a substantial loss.

At no point after the 2006 settlement did plaintiffs bring suit against the bank syndicate for failing to recover the residual payments it was owed under the term facility agreement. Years later, however, on May 10, 2013, the Financial Times published two articles concerning an alleged investigation by the U.S. Department of Justice into whether Barclays had made illegal payments to a Saudi prince in exchange for securing a banking license in Saudi Arabia and repayment of the $900 million term loan related to this case. According to the Financial Times, the Saudi government announced in 2003 that it was accepting applications for banking licenses from non-Arab lenders for the first time since the 1970s. Allegedly after that announcement, Barclays sought help from Saudi Prince Turki bin Abdullah bin Abdel Aziz to resolve the litigation that was pending in this case at that time against the Saudi government in the Southern District of New York. The articles concluded that the lawsuit was settled and Barclays was ultimately granted a banking license from the Saudi government in 2009.

Plaintiffs claim that the Financial Times articles prompted them to commence pre-action discovery in the motion court pursuant to CPLR 3102 (c). That limited disclosure allegedly revealed that Barclays had settled the bank syndicate and CLC's claims against the Saudi government for $925 million, meaning the bank syndicate was repaid in full with no residual amount left over for CLC or plaintiffs' benefit. Therefore, plaintiffs commenced this action against Barclays on October 28, 2014, asserting causes of action for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with prospective economic advantage, tortious interference with contract, "alter ego," and fraud and fraudulent concealment.

Barclays moved the motion court pursuant to CPLR 3211 (a) (1), (5) and (7) and 3016 (e) to dismiss the complaint, arguing, inter alia, that plaintiffs' claims were time-barred. The motion court, agreeing with defendant, granted defendant's motion to dismiss the complaint with prejudice and judgment was entered accordingly. Plaintiffs appealed.

An action in New York based upon fraud must be commenced within the greater of six years from the date of the fraud or within two years from the time plaintiffs discovered, or with reasonable diligence, could have discovered, the fraud (CPLR 213 [8]). Here, the parties do not dispute that the alleged fraud occurred in or around July 2006, the date of the 2006 settlement, more than six years prior to the commencement of plaintiffs' action. Therefore, the question we face is whether plaintiffs commenced their action within two years from the time they discovered, or could have discovered, the alleged fraud with reasonable diligence. Under this inquiry, "when the plaintiff[s] ha[ve] knowledge of facts from which the fraud could be reasonably inferred," they will be held to have discovered the fraud (*Cusimano v Schnurr*, 137 AD3d 527, 531 [1st Dept 2016]).

Plaintiffs allege that they first discovered the facts underlying their fraud-based claims after the Financial Times articles were published in May 2013; they argue they could not have reasonably discovered these facts until then. However, as persuasively argued by defendant, plaintiffs' own complaint establishes that they were on inquiry notice by at least 2008. The following facts are of particular importance to reaching this conclusion. First, by 2003, plaintiffs knew that Barclays voluntarily withdrew from a lawsuit against the Saudi government in the Southern District of New York, a lawsuit in which their complaint contends they "should have prevailed on a claim worth more than $1.25 billion, resulting in the return of a surplus worth hundreds of millions to Plaintiffs."[3] Around the same time, according to plaintiffs' complaint, it was public knowledge that the Saudi government was "contemplating the grant of a license to a Western financial institution to conduct banking activity within Saudi Arabia for the first time in decades." By as early as 2007, plaintiffs learned that Barclays had entered into an undisclosed settlement with the Saudi government around July 2006, which entirely extinguished plaintiffs' right to any surplus amount under the term facility agreement.

Notably, while plaintiffs allege in their complaint that Barclays became their fiduciary after taking over CLC, they admit that Barclays entered the 2006 settlement agreement without ever consulting with them, that Barclays then later "actively

---

**3.** In fact, plaintiffs' counsel at oral argument before the motion court characterized the withdrawal of the lawsuit as "highly unusual."

concealed" the settlement, and "rebuff[ed] all inquiries for further information" between 2006 and 2008. With the realization that plaintiffs were out hundreds of millions of dollars, in 2007, plaintiffs sued the Saudi government in Saudi Arabia seeking to compel its performance under the lease agreements. However, again as set forth by plaintiffs' complaint, the Saudi court ruled in 2008 that because Barclays had settled plaintiffs' claims, they "no longer had any right to recovery from Saudi Arabia." Thus, by at least 2008, plaintiffs were fully aware that Barclays and the Saudi government had settled CLC's claims, and that they would receive no money. By 2009, it became public knowledge that Barclays obtained a Saudi banking license. Yet, the last inquiry plaintiffs alleged to have made to Barclays was in 2008, and plaintiffs fail to allege any investigation they undertook in the years leading up to this action. Plaintiffs' own allegations, which we must accept as true on a motion to dismiss, establish that plaintiffs were apprised of facts from which fraud could have been reasonably inferred by at least 2008. Accordingly, by at least 2008, New York law imposed on plaintiffs a duty to inquire, and plaintiffs' subsequent failure to pursue a reasonable investigation triggered the running of the statute of limitations at that time (*see Koch v Christie's Intl. PLC*, 699 F3d 141, 155 [2d Cir 2012] ["New York law recognizes . . . that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation"]; *see also e.g. Aozora Bank, Ltd. v Deutsche Bank Sec. Inc.*, 137 AD3d 685, 689 [1st Dept 2016] [" '(W)here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him' " (citations omitted)]).

Plaintiffs attempt to avoid dismissal by relying on *Erbe v Lincoln Rochester Trust Co.* (3 NY2d 321, 326 [1957]), which states that whether plaintiffs are "possessed of knowledge of facts from which [fraud] could be reasonably inferred . . . presents a mixed question of law and fact" and therefore, "where it does not conclusively appear that the plaintiffs had knowledge of facts of that nature, a complaint should not be dismissed on motion." Initially, it is worth noting that *Erbe* was decided before the New York Legislature amended CPLR

213 (8) to explicitly codify the duty of inquiry requirement. Yet, in any event, we find that it conclusively appears in this case that the plaintiffs had undisputed knowledge of facts by at least 2008 from which fraud could reasonably be inferred (*Koch*, 699 F3d at 155-156 ["(I)t is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued" (citations omitted)]). Because the statute was triggered by at least 2008, and plaintiffs failed to pursue any investigation until 2013, five years later, plaintiffs are barred from asserting a claim for fraud.

Similarly, plaintiffs' claims for breach of fiduciary duty are time-barred. The parties dispute whether a three-year or six-year limitations period applies. Regardless, even under the longer time period, plaintiffs' claims for breach of fiduciary duty are untimely for the same reasons their claim for fraud is untimely (*see Gonik v Israel Discount Bank of N.Y.*, 80 AD3d 437, 438 [1st Dept 2011]).

Even if plaintiffs' breach of fiduciary duty claims were timely, the motion court properly dismissed them pursuant to CPLR 3211 (a) (7) and 3016 (e), for plaintiffs have failed to allege with particularity the applicable Saudi law and only generally discuss the Saudi concepts of "hawalas" and "wakalas" without citation to any law (*see* CPLR 3016 [e]). Under New York law, the law of the forum (*Bank of N.Y. v Norilsk Nickel*, 14 AD3d 140, 149 [1st Dept 2004], *lv dismissed* 4 NY3d 846 [2005], *appeal dismissed* 4 NY3d 843 [2005]; *Minovici v Belkin BV*, 109 AD3d 520, 525 [2d Dept 2013]), the complaint does not sufficiently allege a fiduciary relationship, and merely contains allegations that these sophisticated parties were dealing at arm's length (*see L. Magarian & Co. v Timberland Co.*, 245 AD2d 69, 70 [1st Dept 1997]).

Plaintiffs' remaining claims for tortious interference, sounding in economic injury, are also time-barred. These claims, which are subject to a three-year statute of limitations, accrued in July 2006, when the 2006 settlement was entered (*see Amaranth LLC v J.P. Morgan Chase & Co.*, 71 AD3d 40, 48 [1st Dept 2009], *lv dismissed and denied* 14 NY3d 736 [2010]). Because the complaint was not filed until nearly eight years later, plaintiffs' claims for tortious interference were properly dismissed as barred by the statute of limitations.

Finally, plaintiffs cannot rely on principles of equitable estoppel to save their complaint. Courts in New York have the

power to apply the "extraordinary remedy" of equitable estoppel only where it would be unjust to permit a defendant to assert a statute of limitations defense (*see Zumpano v Quinn*, 6 NY3d 666, 673 [2006]; *Pahlad v Brustman*, 33 AD3d 518, 519 [1st Dept 2006], *affd* 8 NY3d 901 [2007]). In order for equitable estoppel to apply, plaintiffs bear the burden in showing: (1) plaintiffs were "induced by fraud, misrepresentations or deception to refrain from filing a timely action"; and (2) plaintiffs reasonably relied on defendant's misrepresentations (*Zumpano*, 6 NY3d at 674, quoting *Simcuski v Saeli*, 44 NY2d 442, 449 [1978]). Furthermore, plaintiffs must demonstrate their due diligence in ascertaining the facts and in commencing the action in order to seek shelter under this doctrine (*see Brustman*, 33 AD3d at 520).

Plaintiffs have failed to satisfy their burden to show that equitable estoppel applies in this case. Plaintiffs point to only one alleged misrepresentation by Barclays in their complaint: In May 2002, an executive at Barclays, Elie Khouri, told a representative of plaintiffs in a telephone call that Barclays was "in the process of negotiating a resolution to the dispute [with the Saudi government] and that it would get the best deal possible for Plaintiffs." Further, Mr. Khouri allegedly advised plaintiffs that they should not get involved or bring legal claims. However, plaintiffs have failed to show how this statement amounts to a misrepresentation, because, as defendant points out, this statement was allegedly made before defendant instituted litigation against the Saudi government in December 2002, before the Saudi government announced in 2003 that it was accepting bids for banking licenses from Western banks, and four years before defendant's alleged fraud actually occurred in July 2006 (*see Zumpano*, 6 NY3d at 674 ["It is therefore fundamental to the application of equitable estoppel for plaintiffs to establish that *subsequent and specific actions* by defendants somehow kept them from timely bringing suit" (emphasis added)]).

Moreover, plaintiffs have failed to demonstrate their due diligence, for they were on inquiry notice by at least 2008 and failed to make a reasonable investigation (*see Rite Aid Corp. v Grass*, 48 AD3d 363, 364-365 [1st Dept 2008] ["(E)quitable estoppel . . . will not toll a limitations statute where plaintiffs possessed timely knowledge sufficient to have placed them under a duty to make inquiry"]). Therefore, we reject plaintiffs' claim of equitable estoppel.

We have considered plaintiffs' remaining contentions and find them unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Charles E. Ramos, J.) entered February 17, 2016, dismissing the complaint in its entirety with prejudice, and bringing up for review an order, same court and Justice, entered January 29, 2016, dismissing plaintiffs' claims, should be affirmed, without costs. The appeal from the above order should be dismissed, without costs, as subsumed in the appeal from the judgment.

ANDRIAS, J.P., GISCHE and GESMER, JJ., concur.

Judgment, Supreme Court, New York County, entered February 17, 2016, affirmed, without costs. Appeal from order, same court, entered January 29, 2016, dismissed, without costs, as subsumed in the appeal from the judgment.