John P. Essepian, Plaintiff,

against
The United Group of Companies, Inc.; DAVIS CAPITAL GROUP, INC.; DCG FUNDS MANAGEMENT, LLC; DCG/UGOC FUNDS MANAGEMENT II, LLC; RICHARD W. DAVIS JR; MICHAEL J. UCCELLINI and JESSICA F. STEFFENSEN as Executor and Executrix, Respectively, of the ESTATE OF WALTER F. UCCELLINI; MICHAEL J. UCCELLINI; MCM SECURITIES, LLC; and MILLENNIUM CREDIT MARKETS, LLC, Defendants.


903795-16

Devine, Snyder & Bruno, LLP
Attorneys for Plaintiff
(Terrence J. Devine, of counsel)
52 Corporate Circle, Suite 207
Albany, New York 12203
Keller Rohrback, LLP
Attorneys for Plaintiff (pro hac vice)
(David J. Ko and David Mensher, of counsel)
1201 Third Avenue, Suite 3200
Seattle, Washington 98109
Keller Rohrback, LLP
Attorneys for Plaintiff (pro hac vice)
(Gary A. Gotto, of counsel)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Cozen O'Connor
Attorneys for The United Group of Companies, Inc.; DCG/UGOC Funds Management II; Michael J. Uccellini and Jessica F. Steffensen, as Executor and Executrix, respectively, of the Estate of Walter F. Uccellini; Michael J. Uccellini; MCM Securities, LLC; and Millennium Credit Markets, LLC
(Michael de Leeuw, Tamar S. Wise and Matthew E. Lewitz, of counsel)
45 Broadway
New York, New York 10006


Richard M. Platkin, J.

Plaintiff John P. Essepian brings this commercial action against two sets of defendants: (1) the United Group of Companies, Inc. ("UGOC"), Davis Capital Group, Inc. ("Davis"), Richard W. Davis, Jr., DCG Funds Management, LLC ("DCG"), DCG/UGOC Funds Management II, LLC ("Management II"), Michael J. Uccellini and Jessica F. Steffensen, as executor and executrix of the Estate of Walter F. Uccellini, and Michael J. Uccellini (collectively, "United Defendants"); and (2) MCM Securities, LLC ("MCM") and Millennium Credit Markets, LLC ("Millennium") (collectively, "MCM Defendants").[FN1]

Plaintiff sues to recover for injuries allegedly sustained as a result of investments he made in nonparty DCG/UGOC Income Fund, LLC ("Income Fund" or "Fund"). The Income Fund is managed by Management II, which consists of two members: UGOC, which served as the manager, and DCG. MCM is an SEC-registered broker dealer that was responsible for supervising and monitoring the Fund's sales of securities, and Millennium is an investment bank that is the majority owner of MCM and allegedly is controlled by the United Defendants.
Plaintiff's second amended complaint ("Complaint") alleges causes of action for common-law fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent misrepresentation and unjust enrichment against the United Defendants, and an aiding-and-abetting claim against the MCM Defendants.
The United Defendants and MCM Defendants (collectively, "Moving Defendants") move, pre-answer, for an order pursuant to CPLR 3211 (a) (5) and (7) dismissing the Complaint, [*2]arguing principally that plaintiff's claims are time-barred.[FN2]
 Plaintiff opposes the motion.
BACKGROUND
According to the Complaint, plaintiff made two investments of $375,000 in the Income Fund on July 13, 2010 and July 14, 2010, respectively (see NY St Cts Elec Filing [NYSCEF] Doc No. 11 ["Complaint"] at ¶¶ 1, 51-55). The Income Fund was established, managed and operated by the United Defendants to secure financing for various projects undertaken by UGOC (see id. at ¶¶ 1, 11-16).
UGOC is a long-time real estate investment and development firm. Prior to 2008, UGOC launched an initiative to develop student housing projects near State University of New York ("SUNY") campuses in Plattsburgh, Brockport and Cortland (see id. at ¶¶ 3, 11-12). The late Walter Uccellini was the founder and chairman of UGOC, and his son, Michael Uccellini, is the corporation's President and CEO (see id. at ¶¶ 6-7, 11-12).
The 2008 financial crisis created serious financial problems for UGOC and its plan to obtain bank financing to build the student housing projects (see id. at ¶¶ 13-14). UGOC eventually secured $50 million in financing from TIAA-CREF, but that loan was conditioned upon UGOC raising $18 million in equity (id. at ¶ 15). The United Defendants established the Income Fund in August 2008 as a vehicle to raise such funds from individual investors (see id. at ¶ 16).
On August 8, 2008, the United Defendants issued a private placement memorandum ("PPM") offering for sale $20 million in membership interests in the Income Fund (see id. at ¶ 30; see also NYSCEF Doc No. 12 ["PPM"]). "All of the United Defendants were involved in the preparation . . . of all disclosures made . . . in the PPM" (Complaint at ¶ 59).
The PPM identified Management II as the Fund's manager with "responsib[ility] for the overall management and administration of the Fund, including the acquisition, management and disposition of the Fund's assets" (PPM at 3). "All decisions regarding the use and investment of Income Fund assets were to be made by Management II as [m]anager, by and through [the company's two members:] DCG and UGOC" (Complaint at ¶ 32).
The stated objective of the Income Fund was "to generate . . . stable and durable current yield and, where possible, the potential for longer-term gains" (PPM at 2, 13). The Fund's investment strategy was to:
[I]nvest in (A) securities and debt instruments secured by assets and/or credible guarantors, real estate and real estate related investments, (B) real estate assets which target existing properties which have achieved stabilized occupancy levels with demonstrated records of distributing cash flow or where cash flows can be significantly enhanced and (C) real estate property and investments that can be converted to cash during the next five to seven years with targeted annual current rates of returns to the Income Fund of greater than 9%
(Complaint at ¶ 31; see PPM at 2). The Fund's Operating Agreement described an identical [*3]investment strategy (see NYSCEF Doc No. 13 ["Operating Agreement"] at 8).[FN3]

The first pages of the PPM disclosed the risks associated with an investment in the Income Fund and offered the following warning to potential investors:
AN INVESTMENT IN THE INTERESTS WILL INVOLVE SIGNIFICANT RISKS DUE, AMONG OTHER THINGS, TO THE NATURE OF THE FUND'S INVESTMENTS. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT THE RISKS AND LACK OF LIQUIDITY THAT ARE CHARACTERISTIC OF THE INVESTMENT DESCRIBED HEREIN. NO ASSURANCE WILL BE GIVEN THAT THE FUND'S INVESTMENT OBJECTIVE WILL BE ACHIEVED OR THAT INVESTORS WILL RECEIVE A RETURN ON THEIR CAPITAL (PPM at iii).
The body of the PPM then went on to discuss the "INVESTMENT CONSIDERATIONS AND RISK FACTORS" and warned of the "High Risk of Loss": "An investment in the [Income Fund] is highly speculative and involves significant risks, including the possible loss of the entire amount invested" (id. at 24-31 [emphasis in original]).
The PPM represented that Management II could retain "placement agents," with the consent of investors, to "assist in the private placement of [i]nterests in the Fund" (PPM at 14; see Complaint at ¶ 63), but neither the PPM nor the Operating Agreement disclosed any financial arrangements between UGOC and any such agents (see Complaint at ¶¶ 62, 67). The only disclosure "even remotely touching" on the financial arrangements between UGOC and third-party consultants was a "vague" disclosure filed with the Securities and Exchange Commission ("SEC") by PageOne Financial Inc. ("PageOne") on or about July 31, 2009 and amended on September 14, 2010 (see id. at ¶¶ 64-66).
Edgar Page was an investment advisor and the chief executive of PageOne, an SEC-registered investment advisory firm (see id. at ¶ 17). Page and his firm had long-standing relationships of trust with high-net-worth investors who relied upon his investment advice (see id. at ¶ 18). Plaintiff was a client of PageOne, and he allegedly purchased $750,000 in membership interests in the Income Fund on the advice and recommendation of Page (see id. at ¶ 29).
The Complaint alleges that prior to plaintiff's investment, UGOC secretly had agreed to purchase PageOne in exchange for Page's commitment to buy $18.3 million worth of UGOC preferred stock using the assets of PageOne's clients (see id. at ¶¶ 24, 26). UGOC also allegedly offered to hire Page as its manager, refer him over $1 billion in assets from labor unions, and provide PageOne with a commission for each sale of UGOC securities made to PageOne's clients (see id. at ¶¶ 25, 27). 
Page was aware that the United Defendants were investing the Income Fund's assets into student housing projects that faced significant problems, rendering the investments highly risky (see id. at ¶¶ 37-38, 42, 43-50). For instance, Walter Uccellini informed Page in February 2009 that if UGOC did "not have several million dollars collected (in our hands to be spent) by next week, it might very well be necessary to shut down the student housing [projects]" (id. ¶ 37). [*4]The various construction and occupancy issues associated with the projects were not disclosed to potential investors by the United Defendants in any communications associated with the Income Fund (see id. at ¶¶ 45-47, 56-57). The projects eventually defaulted and became the subject of foreclosure and/or bankruptcy proceedings (see id. at ¶¶ 48-50).
Nevertheless, Page met with plaintiff in late June and/or early July 2010 and persuaded him to invest in the Income Fund (see id. at ¶¶ 51-55). In soliciting plaintiff's investment, Page represented that student housing projects "were a sound and conservative investment which would generate an internal rate of return of investment of not less than 9% annually and as much as 20-25% or more" (id. at ¶ 52). Page also claimed that "the United Defendants guaranteed that [plaintiff] would generate a return on investment of not less than 9% each year" (id. at ¶ 53).
Relying on Page's advice, plaintiff executed Subscription Agreements for the purchase of membership interests in the Fund, allegedly on July 13, 2010 and July 14, 2010 (see id. at ¶ 54). Simultaneously therewith, plaintiff executed the Operating Agreement for the Fund and paid $750,000 (see id. at ¶ 55). By the time these transactions took place, Walter Uccellini had "directed MCM to refrain from performing compliance and supervisory activity regarding sale of securities in the Income Fund" (id. at ¶ 129).
The SEC initiated proceedings against Page and PageOne in August 2014 (see id. at ¶ 68) and issued an Order Making Findings ("SEC Order") in March 2015. The SEC found that Page and his firm had "willfully violated Sections 206(1) and 206(2) of the [Investment Advisers Act of 1940], which prohibit fraudulent conduct by an investment adviser[,]" and Section 207 of the Advisers Act, "which makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the [SEC] . . . or willfully to omit to state in any such application or report any material fact which is required to be stated therein" (id. at ¶ 69 [internal quotation marks omitted]). 
The SEC Order confirmed that Page had failed to disclose his arrangement with UGOC to clients (see id. at ¶¶ 70-72). The SEC also found that Page knew that UGOC "did not have sufficient liquidity . . . to complete the acquisition of PageOne" and was "selling personal assets to keep [UGOC's] business going" (id. at ¶ 78). The SEC ultimately concluded that PageOne's clients "invested between approximately $13 and $15 million" and that UGOC had paid Page approximately $2.7 million during the same period (id. at ¶¶ 75-78).
Plaintiff commenced this action on July 12, 2016 (see NYSCEF Doc No. 1) and filed his Second Amended Complaint ("Complaint") on or about August 29, 2016. The Complaint alleges causes of action for common law fraud, breach of fiduciary duty and/or aiding and abetting in a breach of fiduciary duty, negligent misrepresentation and unjust enrichment against the United Defendants (see Complaint at ¶¶ 94-123), as well as a claim of aiding and abetting against the MCM Defendants (see id. at ¶¶ 124-135). While Page and PageOne are not named as defendants, the Complaint refers to them extensively and asserts that they acted as an agent of the United Defendants relative to plaintiff's investment (see id. at ¶¶ 28, 56, 82, 87).
Plaintiff alleges that the United Defendants, together with Page as their alleged agent, made factual misrepresentations in soliciting plaintiff's investments. Specifically, plaintiff alleges that the United Defendants falsely claimed that the Fund would invest in secured debt instruments backed by real estate assets that could quickly be converted to cash and would generate a high annual rate of return for investors, whereas the United Defendants allegedly knew [*5]that the troubled student-housing projects faced significant problems that made these returns highly unlikely and created a substantial risk of default (see id. at ¶ 56). Plaintiff also alleges that the United Defendants misrepresented UGOC's serious financial problems and its history of poor performance on similar projects (see id.).
The Complaint further alleges that the United Defendants and Page failed to disclose facts that were highly material to plaintiff's decision to invest in the Income Fund:
(A) UGOC was in serious financial distress and was unable to survive without investor funds;
(B) UGOC lacked sufficient finances to maintain operations and, therefore, had to use unsecured Fund assets to cover its operating costs;
(C) the Fund had invested almost all of its assets in unsecured notes receivable to UGOC-affiliated companies;
(D) the student housing projects in Plattsburgh, Brockport, and Cortland, which had borrowed more than $7.1 million from the Fund, had encountered serious financial problems and low occupancy that created a material risk that the Fund's note receivables would not be repaid or would not generate the promised interest rate of return to investors;
(E) the Fund's assets had been used to cover personal expenses of the Uccellini family and future investments would continue to be used in that manner;
(F) UGOC and its related entities had no procedures in place to assure that Fund investments would only be used to generate for its members stable and durable current yields and, where possible, the potential for longer-term gains; and
(G) the Fund regularly renewed unsecured loans to UGOC affiliates and accrued interest income on such loans due at maturity even though the United Defendants failed to assess the credit risk exposure of each borrower entity at the time and report to investors an adequate allowance for credit losses in the Fund financial statements (id. at ¶ 57 [internal quotation marks and brackets omitted]).
Plaintiff alleges that he would not have invested in the Income Fund but-for the foregoing misrepresentations and concealments by the United Defendants and their alleged agents (see id. at ¶¶ 89, 91). Now, however, "[u]nder the terms of the [O]perating [A]greement governing the Fund, [p]aintiff is unable to liquidate his investment without the approval of the United Defendants which has never been authorized" (id. at ¶ 91). The Complaint seeks the rescission of the Subscription Agreements, as well as various forms of monetary damages (see id., Wherefore clause). 
On September 19, 2016, the United Defendants and MCM Defendants moved to dismiss the Complaint for, among other things, failure to state a claim (see NYSCEF Doc Nos. 8-13). After the motion was fully briefed, the Moving Defendants discovered that the Complaint contained a highly material irregularity bearing on the timeliness of plaintiff's claims.
The Complaint alleged that plaintiff entered into Subscription Agreements for the purchase of interests in the Income Fund on July 13, 2010 and July 14, 2010, respectively (see Complaint at ¶ 54). However, review of the actual Subscription Agreements shows that plaintiff signed the documents on June 18, 2010 (see NYSCEF Doc Nos. 45-46 ["Subscription Agreements"]). Upon making this discovery, the Moving Defendants alerted plaintiff's counsel [*6]and asserted that all of plaintiff's claims were time-barred (see NYSCEF Doc No. 42).
In response, plaintiff's counsel confirmed that the allegations of the Complaint were incorrect and that plaintiff had "signed the Subscription Agreements reflecting his interest in the Income Fund on June 18, 2010" (NYSCEF Doc No. 43). Counsel further indicated that a similar statute-of-limitations issue was pending before Hon. Gary L. Sharpe in the U.S. District Court for the Northern District of New York in Grasso, et al. v United Group of Companies, Inc., et al., Case No. 1:16-cv-00965-GLS-CFH (ND NY) ("Grasso") — a virtually identical case brought by a group of Fund investors against the same defendants sued herein (see NYSCEF Doc No. 51 ["Grasso Complaint"]).[FN4]

By so-ordered stipulation dated February 16, 2017, the parties agreed to stay this action pending Judge Sharpe's ruling on the statute-of-limitations issue in Grasso and to thereafter provide supplemental briefing (see NYSCEF Doc No. 44).
On March 26, 2018, Judge Sharpe issued a Decision and Order in Grasso that dismissed the majority of plaintiffs' claims as time-barred (see NYSCEF Doc No. 50; Grasso v United Group of Companies, Inc., 2018 WL 1472579, 2018 US Dist LEXIS 48841 [ND NY, Mar. 26, 2018, No. 1:16-cv-965 (GLS/CFH)], op amended and superseded 2018 WL 1737619 [ND NY, Apr. 9, 2018, No. 1:16-cv-965 (GLS/CFH)]).
ANALYSIS
Dismissal is warranted under CPLR 3211 (a) (5) where the movant establishes that a claim may not be maintained due to the expiration of the statute of limitations. The movant bears the initial burden of "support[ing] the motion with an affidavit or other competent proof sufficient, if uncontroverted, to establish the [statute of limitations] defense as a matter of law" (State of NY Higher Educ. Servs. Corp. v Starr, 158 AD2d 771, 771 [3d Dept 1990]; see Romanelli v Disilvio, 76 AD3d 553, 554 [2d Dept 2010]). Upon such proof, "the burden shifts to the party opposing the motion to aver evidentiary facts" sufficient to defeat the statute of limitations defense, or at least raise factual questions concerning the defense (Hoosac Val. Farmers Exch. v AG Assets, 168 AD2d 822, 823 [3d Dept 1990]; see Doyon v Bascom, 38 AD2d 645, 645-646 [3d Dept 1971]).
On a motion to dismiss made pursuant to CPLR 3211 (a) (7), "the court must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). The court's "sole criterion is whether the pleading states a cause of action" (Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001] [internal quotation marks and citation omitted]). However, the court need not "accept as true legal conclusions or factual allegations that are either inherently incredible or flatly contradicted by documentary evidence" (1455 Washington Ave. Assoc. v Rose & Kiernan, 260 AD2d 770, 771 [3d Dept 1999] [internal quotation marks and citations omitted]).
A. Fraud-Based Claims
Under New York law, "[a]n action to recover damages for fraud must be commenced within 'the greater of six years from the date the cause of action accrued or two years from the [*7]time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it' (CPLR 213 [8]; see CPLR 203 [g])" (Marasa v Andrews, 69 AD3d 584, 584 [2d Dept 2010]; see Soghanalian v Young, 131 AD3d 744, 745 [3d Dept 2015]; Giarratano v Silver, 46 AD3d 1053, 1056 [3d Dept 2007]). Plaintiff's causes of action for breach of fiduciary duty, aiding and abetting, and negligent misrepresentation all sound in actual fraud and, therefore, are subject to the same limitations period as his fraud claim (see Krog Corp. v Vanner Group, Inc., 158 AD3d 914, 917 [3d Dept 2018]; Cusimano v Schnurr, 137 AD3d 527, 530 [1st Dept 2016]; see also Brick v Cohn-Hall-Marx Co., 276 NY 259, 264 [1937] [courts must look at "the essence of the action and not its mere name"]). 
The Subscription Agreements provide that "the Investor's obligation . . . shall be complete and binding upon execution and delivery" of the Subscription Agreements, and the investor will be admitted as a member of the Fund "[u]pon acceptance of the subscription by [Management II] on behalf of the Fund" (NYSCEF Doc Nos. 45 at 1 & Doc No. 46 at 1). There is no dispute that plaintiff executed and delivered the Subscription Agreements, and Management II accepted them, on June 18, 2010 (see id. at 10). Thus, for purposes of the six-year limitations period, the fraud-based claims accrued on June 18, 2010, at which point plaintiff became legally bound to the Income Fund in alleged reliance on the United Defendants' fraudulent misrepresentations and concealments (see CPLR 203 [a]; Prichard v 164 Ludlow Corp., 49 AD3d 408, 408 [1st Dept 2008]; Matter of Blake, 282 AD2d 905, 906 [3d Dept 2001]).[FN5]
 As such, there can be "no serious dispute" that the fraud-based claims are untimely under the six-year limitations period (Pommer v Trustco Bank, 183 AD2d 976, 977 [3d Dept 1992]).[FN6]

The issue then becomes whether the fraud claims are timely under CPLR 213 (8)'s two-[*8]year discovery rule. "For the purposes of the discovery rule, a plaintiff's cause of action accrues at the time the plaintiff possesses knowledge of facts from which the fraud could have been discovered with reasonable diligence" (Marasa, 69 AD3d at 584 [internal quotation marks and citations omitted]; see CPLR 213 [8]; 203 [g]; Gutkin v Siegal, 85 AD3d 687, 687 [1st Dept 2011]). 
"The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred'" (Sargiss v Magarelli, 12 NY3d 527, 532 [2009] [internal quotation marks and citation omitted]; see Elhannon, LLC v Brenda J. DeLuca Trust, 108 AD3d 911, 912 [3d Dept 2013]). "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he [or she] has been defrauded, a duty of inquiry arises, and if he [or she] omits that inquiry when it would have developed the truth, and shuts [one's] eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him [or her]" (Gutkin, 85 AD3d at 688 [internal quotation marks, citations and brackets omitted]; accord CIFG Assur. N. Am., Inc. v Credit Suisse Sec. [USA] LLC, 128 AD3d 607, 608 [1st Dept 2015]; see Shalik v Hewlett Assoc., L.P., 93 AD3d 777, 778 [2d Dept 2012]).
"The burden of establishing that the fraud could not have been discovered before the two-year period prior to the commencement of the action rests on the plaintiff, who seeks the benefit of the exception" (Celestin v Simpson, 153 AD3d 656, 657 [2d Dept 2017] [internal quotation marks and citation omitted]; see Grasso v Grasso, 45 AD3d 1022, 1023 [3d Dept 2007]). "[W]hile . . . New York courts will not grant a motion to dismiss a fraud claim where the plaintiff's knowledge is disputed, it is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts [or documentary evidence] establish that a duty of inquiry existed and that an inquiry was not pursued" (Koch v Christie's Intern. PLC, 699 F3d 141, 155-156 [2d Cir 2012]; see e.g. Elhannon, 108 AD3d at 912-913; Shalik, 93 AD3d at 778; Gutkin, 85 AD3d at 688). 
Plaintiff concedes that following his June 18, 2010 investment in the Income Fund, he received "statements, letters and other correspondence" regarding his investment, including the Fund's 2012 and 2013 Audited Financial Statements (Complaint at ¶ 67; see id. at ¶¶ 39, 57 [G]; see also NYSCEF Doc Nos. 47, 48). For the reasons that follow, the Court agrees with Judge Sharpe that the Fund's 2012 and 2013 financial statements plainly "raised red flags that would have made a reasonable investor of ordinary intelligence aware of the probability that he [or she] had been defrauded" (Grasso, 2018 WL 1737619, *8).[FN7]

The 2013 Financial Statement, which plaintiff admittedly received no later than May 30, 2014 (see NYSCEF Doc No. 52, p. 6), advised plaintiff that the student housing projects at SUNY Plattsburgh, Brockport and Cortland "continue to have occupancy issues" and informed him that "the lender commenced a foreclosure action against the project[s]" (NYSCEF Doc No. 47 ["2013 Financial Statement"] at 1-3, 5, 15, 20-22; see also NYSCEF Doc No. 48 ["2012 [*9]Financial Statement"] at 20-21).
The 2013 Financial Statement, which included the report of the Fund's independent auditor, also cautioned plaintiff in several places that "the Fund is substantially invested in debt investments with an entity that is in foreclosure proceedings. The outcome of these proceedings is unknown; however, the proceedings raise substantial doubt about the Fund's ability to continue as a going concern" (2013 Financial Statement at 5 [emphasis added]; see also id. at 15 ["uncertainty about the Fund's ability to continue as a going concern"]).
In addition, the 2013 Financial Statement advised plaintiff that "debt investments make up 55% of the [Income] Fund's total assets" (id. at 15). And both the 2012 and 2013 statements alerted investors that the Fund had invested in classes of assets that plaintiff believes to have been improper and contrary to the representations made to him to induce his execution of the Subscription Agreements (see 2012 Financial Statement at 5-14; 2013 Financial Statement at 7-11).
These disclosures go to the heart of plaintiff's fraud-based allegations regarding the struggling SUNY housing projects (see Complaint at ¶¶ 43-50) and the manner in which the Fund invested the capital it had raised from plaintiff and other investors (see id. at ¶¶ 38, 56-57). In fact, plaintiff admits in his Complaint that the 2012 and 2013 financial statements "created uncertainty regarding the Income Fund's ability to continue as a going concern . . . [and] affected the debt instruments . . . of . . . student housing projects developed by UGOC and represented . . . as the primary investments to be financed using the assets of the [Fund]" (id. at ¶ 42). In other words, "the knowledge gleaned from the information contained within the 2012 and 2013 [F]inancial [S]tatements [was] completely at odds with the representations that plaintiff[] allegedly relied upon" in deciding to invest in the Income Fund (Grasso, 2018 WL 1737619, *8; see Complaint at ¶¶ 56 [C], [D]; 57 [D])
In opposing dismissal, plaintiff argues that "no duty of inquiry arose in 2014 . . . because the 2012 and 2013 Financial Statements . . . informed [p]laintiff [that] the Fund's performance was improving year after year" (NYSCEF Doc. No. 52 at 5). In particular, plaintiff stresses that "the 2013 Financial Statement indicated [that] the Fund's total assets increased from $16.7 million to $17.8 million from 2012 to 2013, and the investors' collective equity in the Fund increased at a nearly identical rate" (id.). "The statement also revealed that the Fund's investment income was approximately $1.6 million, and that on an income tax basis, the net balance of the Fund grew from $15.8 million as of January 1, 2012 to $17.8 million as of December 31, 2013" (id. at 5-6). "The 2012 Financial Statement . . . painted a similarly optimistic picture" (id. at 6). Plaintiff also notes that the 2013 Financial Statement reassured the investors that the management had implemented a plan to address the occupancy issues with respect to the student housing projects (see id. at 8).
In rejecting the same contentions in Grasso, Judge Sharpe aptly noted that plaintiff's argument "misses the mark" (Grasso, 2018 WL 1737619, *8). The issue is not whether the 2012 and 2013 financial statements revealed the full and complete extent of the Moving Defendants' alleged fraud, but rather whether the circumstances disclosed in the financial statements reasonably suggested that plaintiff "may have been defrauded, so as to trigger a duty to inquire" (Shalik, 93 AD3d at 778; see Davis v Smith Corp., 262 AD2d 752, 755 [3d Dept 1999]).
In light of the auditor's warning that the Fund's major investments were in default and/or [*10]foreclosure and that there were substantial doubts about the Fund's ability to continue as a going concern, the fact that the Fund's management offered a vague reassurance regarding a "plan" for increasing student occupancy is not the type of reassurance that would — or should — put a reasonable investor's mind at ease (see 2013 Financial Statement at 8-11; Grasso, 2018 WL 1737619, *8). In other words: [N]o reasonable investor would look at the serious warnings set out by the auditor — warnings that the Income Fund's future was in jeopardy — and rely on vague, unspecified hopes for a turnaround. Instead, the financial statements raised red flags that would have made a reasonable investor of ordinary intelligence aware of the probability that he [or she] had been defrauded (Grasso, 2018 WL 1737619, *8 [brackets omitted]; see Gutkin, 85 AD3d at 688; Ballhaus v Morgan Guar. Trust Co. of NY, 232 AD2d 320, 320 [1st Dept 1996], lv denied 89 NY2d 808 [1997]).
As to the argument that the Fund's bottom line was increasing, plaintiff ignores the fact that the financial statements "used an analysis centered on an income tax basis" (Grasso, 2018 WL 1737619, *8). Indeed, the 2013 Financial Statement expressly disclosed that the use of an income tax basis did not comport with "accounting principles generally accepted in the United States" (pp. 4-5; see also Grasso Complaint, ¶ 160 [alleging that the use of an income tax basis "avoid[s] the disclosures of fair value measures and credit quality of financing receivables"]). Indeed, the auditor found the use of an income tax basis to be so significant that the bottom of each page of the financial statement cautioned readers that "income tax basis" was "an integral part of the[] financial statements" (2013 Financial Statement, Independent Auditor's Report, at 3-11).
The Court therefore concludes that the Financial Statements for 2012 and 2013 placed an objective investor in the Fund on notice of the substantial prospect that he or she had been defrauded.[FN8]
 Plaintiff does not allege in his Complaint that he made any inquiry in response to the financial statements to determine whether he had been defrauded. Nor does plaintiff submit proof in opposition to the motion demonstrating any such inquiry. Accordingly, knowledge of the fraud must be imputed to plaintiff as of the date the duty to investigate arose, which occurred no later than May 30, 2014, by which time plaintiff had received both the 2012 and 2013 Financial Statements (see Aozora Bank, Ltd. v Deutsche Bank Sec. Inc., 137 AD3d 685, 689-690 [1st Dept 2016]; CIFG Assur. N. Am., 128 AD3d at 608; Shalik, 93 AD3d at 778; Gutkin, 85 AD3d at 688). 
As plaintiff failed to commence this action within two years of being put on inquiry notice, plaintiff's fraud-based claims are not saved by application of the discovery rule. Accordingly, the fraud-based claims must be dismissed as barred by the expiration of the statute [*11]of limitations.
B.Unjust Enrichment
The Moving Defendants also seek dismissal of the unjust enrichment claim as barred by the expiration of the statute of limitations. In their opening brief, they argued principally that the claim is subject to the three-year limitations period of CPLR 214 (3), rather than the six-year limitations period of CPLR 213 (1) (see Ingrami v Rovner, 45 AD3d 806, 808 [2d Dept 2007]; Lambert v Sklar, 30 AD3d 564, 566 [2d Dept 2006]).[FN9]
 
Regardless, given plaintiff's admission that the Subscription Agreements were executed, delivered and accepted more than six years prior to the commencement of this action, the Court concludes that the unjust enrichment claim is time-barred regardless of which limitations period applies. "A cause of action for unjust enrichment accrues 'upon the occurrence of the wrongful act giving rise to the duty of restitution'" (Elliott v Qwest Communications, Corp., 25 AD3d 897, 898 [3d Dept 2006], quoting Congregation Yetev Lev D'Satmar v 26 Adar N.B. Corp., 192 AD2d 501, 503 [2d Dept 1993]; see NYAHSA Servs., Inc., Self-Ins. Trust v People Care Inc., 156 AD3d 99, 104 [3d Dept 2017]). Here, the United Defendants are alleged to have benefitted from the alleged misrepresentations and omissions that induced plaintiff to purchase membership interests in the Fund, which occurred by June 18, 2010. Thus, the claim is untimely.
CONCLUSION
Based on the foregoing,[FN10]
 it is
ORDERED that the motion to dismiss of defendants The United Group of Companies, Inc., DCG/UGOC Funds Management II, Michael J. Uccellini and Jessica F. Steffensen, as Executor and Executrix of the Estate of Walter F. Uccellini, Michael J. Uccellini, MCM Securities, LLC and Millennium Credit Markets, LLC is hereby granted, and the Second Amended Complaint is dismissed as against these defendants, with prejudice; and it is further
ORDERED that plaintiff shall advise the Court as to the status of his claims against defendant Richard W. Davis Jr. and his intentions with regard to the prosecution of such claims within twenty (20) days of being served with a copy of this Decision & Order with notice of [*12]entry.
This constitutes the Decision & Order of the Court, the original of which is being transmitted to the Albany County Clerk for electronic filing and entry. Upon such entry, counsel for the Moving Defendants shall promptly serve notice of entry on all other parties to this action (see Uniform Rules for Trial Cts [22 NYCRR] § 202.5-b [h] [1], [2]).
Dated: Albany, New York
July 23, 2018
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1, 8-16, 23-27, 39-53.



Footnotes

Footnote 1: Counsel for the moving defendants does not represent DCG, which is a wholly-owned subsidiary of Davis, or Richard W. Davis Jr, who is the CEO and founder of Davis. Plaintiff's claims against DCG and Davis (but not Davis Jr.) are stayed pursuant to a receivership order of the U.S. District Court for the Western District of North Carolina (see NYSCEF Doc Nos. 16, 28). With respect to Davis Jr., the Court observes that he purportedly was served with process on October 27, 2016 (see NYSCEF Doc No. 29), but the record contains no answer or notice of appearance by or on his behalf. Nor is there a record of any proceedings for a default judgment taken by plaintiff against Davis Jr. (see generally CPLR 3215). 

Footnote 2: The motion also is made pursuant to CPLR 3211 (a) (1), but the documentary evidence relied upon by the Moving Defendants pertains to their statute-of-limitations defense, which is cognizable under CPLR 3211 (a) (5).

Footnote 3: According to the PPM, the Operating Agreement also controlled the parties' relationship (see PPM at iii-iv).

Footnote 4: Further, the parties in Grasso were represented by the same attorneys who have appeared herein.

Footnote 5: Contrary to plaintiff's contention, the accrual of fraud-based claims in New York is not based on when the plaintiff "had full knowledge of the fraud, including the injury and damages he sustained from it" (NYSCEF Doc No. 52 at 1, 5, 9). As the Moving Defendants observe, if this were the law, there would be no need for the two-year discovery rule of CPLR 213 (8). Moreover, this argument is inconsistent with the allegations of plaintiff's own Complaint, which maintains that the fraud-based claims are timely because they were brought "within six years from the date of the wrongful acts and within two years of the date of discovery of [d]efendants' fraud through the exercise of reasonable diligence" (id. at ¶ 93). Relatedly, the Court observes that the Complaint does allege that plaintiff sustained injury once the Subscription Agreements became final and binding on June 18, 2010, at which point his investment was irrevocably tied up in the Fund, and plaintiff had the right to pursue a claim for recision (see Complaint ¶ 91 & Wherefore clause).

Footnote 6: While plaintiff concedes that he executed the Subscription Agreements on June 18, 2018, the Complaint continues to allege that he received the PPM for the Income Fund in "late June or early July 2010" (Complaint at ¶ 51) and that the misrepresentations in the PPM induced him to purchase interests in the Fund (see e.g. id. at ¶¶ 56, 61-63). Inasmuch as plaintiff executed the Subscription Agreements prior to receiving the PPM, he could not have relied upon the PPM in choosing to invest in the Fund. Thus, plaintiff's allegations of fraud based on the contents of the PPM are not plausible.

Footnote 7: While the New York courts are not bound by the holdings of the lower federal courts (see generally People v Kin Kan, 78 NY2d 54, 59-60 [1991]), particularly as to matters of New York law, this Court finds Judge Sharpe's decision in Grasso to be a highly persuasive application of the two-year discovery rule.

Footnote 8: In so concluding, the Court notes that plaintiff's reliance on Milman v Box Hill Sys. Corp. (72 F Supp 2d 220 [SD NY 1999]) is misplaced. That case involved the discovery rule under Section 13 of the Securities Act (see id. at 228-229), not the discovery rule of CPLR 213 (8). Further, the Second Circuit subsequently confirmed, in a case involving New York's discovery rule, that "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty . . . only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern" (AXA Versicherung AG v New Hampshire Ins. Co., 391 Fed Appx 25, 30 [2d Cir 2010] [internal quotation marks and citation omitted] [emphasis added]). 

Footnote 9: The CPLR does not prescribe a limitations period for unjust enrichment, and there appears to be a split between the Second and First Departments as to whether a six-year or a three-year limitations period should be applied (compare Deutsche Bank, AG v Vik, 142 AD3d 829, 829 [1st Dept 2016], with Lambert, 30 AD3d at 566; but see Board of Mgrs. of the Chelsea 19 Condominium v Chelsea 19 Assoc., 73 AD3d 581, 582 [1st Dept 2010] [applying three-year statute of limitations, relying on Lambert]). However, the Moving Defendants have not cited any authority from the Third Department in support of their contention that the Court should apply the three-year limitations period, and, in fact, the Third Department routinely applies the six-year statute of limitations to unjust enrichment claims (see e.g. NYAHSA Servs., Inc., Self-Ins. Trust v People Care Inc., 156 AD3d 99, 104 [3d Dept 2017]; Elliott v Qwest Communications Corp., 25 AD3d 897, 898 [3d Dept 2006]). 

Footnote 10: Having concluded that all of plaintiff's claims against the Moving Defendants are barred by the expiration of the statute of limitations, the Court has no occasion to consider the Moving Defendants' challenges to the legal sufficiency of plaintiff's claims.